**United States District Court**
**Southern District of New York**
————————————————————————

In re TELIGENT INC., et al.,
                    Debtors.
————————————————————————

UNSECURED CLAIMS ESTATE REPRESENTATIVE           <u>OPINION AND ORDER</u>
OF TELIGENT, INC., et al.,
                                                 04 Civ. 6171 (JGK)
                    Appellant,

          – against –

CIGNA HEALTHCARE, INC.,
                    Appellee.
————————————————————————

**JOHN G. KOELTL, District Judge:**

     This is an appeal pursuant to 28 U.S.C. § 158(a)(1) by
Savage & Associates, P.C., the Unsecured Claims Estate
Representative (the "Representative") for the debtors, Teligent,
Inc., et al. (collectively "Teligent").  The Representative
seeks review of the May 27, 2004 bench decision and subsequent
Order dated June 10, 2004, in which the Bankruptcy Court granted
summary judgment to the appellee, Cigna Healthcare ("Cigna") and
dismissed the Representative's amended complaint against Cigna.
(<u>See</u> Ex. S at 94-101; Ex. Q.[1])  In that decision, the Bankruptcy
Court found that Teligent had assumed a group insurance contract
issued by Cigna to provide health and dental benefits for
Teligent's employees.  The Representative, seeking the recovery

------------------------------------------------------------

[1]References to "Ex. __" are to exhibits included as part of the
record on appeal as prepared by the appellant Representative.

of pre-petition and post-petition transfers made by Teligent to
Cigna, contends that the original insurance contract executed in
January 1998 could not be assumed because each re-rating of the
insurance contract gave rise to a new and separate contract, and
that the original contract had terminated before it was
allegedly assumed.  The Bankruptcy Court rejected the
Representative's argument.  The Bankruptcy Court found that the
alleged preference payments made by Teligent to Cigna in
connection with the insurance contract were payments on a single
insurance contract, which had never terminated, and that
Teligent assumed the insurance contract in October 2002.  (See
Ex. S at 94-101.)  The Representative now appeals the Bankruptcy
Court's determination.

I.

The following facts are undisputed unless otherwise noted.

Teligent, Inc. was the ultimate parent corporation of
twenty domestic subsidiaries, all debtors and debtors in
possession before the Bankruptcy Court, as well as many non-
debtor foreign subsidiaries.  In re Teligent, Inc., 282 B.R.
765, 766 (Bankr. S.D.N.Y. 2002).  Prior to the May 21, 2001
petition date, the debtors were primarily engaged in providing
telecommunications services to wholesale and retail customers.
Id. at 766-67.  In or about January 1998, Teligent and Cigna

executed the Teligent Group Insurance Policy 2253887/242337 (the

"Policy") to provide group medical and dental insurance services

to Teligent, its employees, and their dependents.[2]  (See letter

dated Oct. 20, 2000 from Michael W. Drago to John Barrett at

A122.[3])  The Policy was originally issued in and subject to the

laws of Virginia (see Policy at A125) and later modified in

October 2000 to be "sitused" in Delaware effective January 1,

2001.  (See letter dated Oct. 20, 2000 from Michael W. Drago to

John Barrett at A122.)  The Policy included, among other things,

provisions concerning changes in premium rates.  (See Policy at

A138-39.)  Under the heading "Changes in Premium Rates," the

Policy provided that:

> Any premium rate may be changed by the Insurance Company
> from time to time with at least 31 days advance written

[2]The Policy was initially issued to The Associated Group, Inc.
Teligent, Inc. was named as the Policyholder by an amendment
issued December 2, 1998 bearing an effective date of January 1,
1999.  (See Policy at A148-150, A152.)

[3]References to "A__" are to exhibits included as part of the
Appendix to Appellee Cigna Healthcare's Answering Brief on
Appeal ("Cigna Appendix").  There is some overlap between the
exhibits in Cigna's Appendix and the record on appeal that was
submitted by the Representative.  Where both compilations
include identical copies of a relevant document, citations to
Cigna's Appendix are provided in order to cite specific pages.
Unless noted, these references to the "A__" materials are
identical to the "Ex __" materials submitted by the
Representative, but the "A__" materials are cited because the
"Ex __" are not paginated in the Representative's record on
appeal.  Documents that are included in the Cigna Appendix but
that were not included in the Representative's record on appeal
are referenced as "Cigna Appendix, Tab __."

notice.  No such change will be made until 12 months after the Effective Date . . . .

The Insurance Company may change rates immediately if, following the latter of the effective date or renewal date, the enrolled population either increases or decreases by 15% or more.

As of any Anniversary Date after the policy has been in force for 12 months, the Insurance Company may grant a credit in such amount as it may determine, based on experience.  The experience under this policy may be combined with the experience under other contracts issued by the Insurance Company or its affiliates and covering the policyholder or its employees.

(Policy at A138.)

Moreover, either party had the right to cancel the Policy under certain conditions.  (See Policy at A140, A146-47.)  Below the heading entitled "Cancellation of Policy," the Policy provided:

The Policyholder may cancel the policy as of any Premium Due Date by giving written notice to the Insurance Company before that date.

The Insurance Company may cancel the policy as of any Premium Due Date if the number of Insured Employees is less than 25 or less than 75% of those eligible.  Dependent Insurance may be cancelled as of any Premium Due Date if the number of Employees insured for their Dependents is less than 75% of those eligible.

If a premium is not received at the Home Office or by an authorized agent of the Insurance Company when due, the policy will be automatically cancelled as of the Premium Due Date, except as set forth below . . . .

If, before a Premium Due Date, the Policyholder has not given written notice to the Insurance Company that the policy is to be cancelled, a Grace Period of 31 days will be granted for the payment of each premium after the initial premium.  The policy will stay in effect during

4

that time.  If any premium is not received at the Home
Office or by an authorized agent of the Insurance Company
by the end of the Grace Period, the policy will be
automatically cancelled at the end of the Grace Period;
except that, if the Policyholder has given written notice
in advance of an earlier date of cancellation, the policy
will be cancelled as of the earlier date.  The Policyholder
will be liable to the Insurance Company for any unpaid
premium for the time the policy was in force[.]

(Policy at A140.)

The Policy was amended by the parties periodically (<u>see</u> Policy

at A146-A154), and the Policy includes an amendment dealing

specifically with cancellation.  According to this amendment,

effective January 1, 1998:

> The Insurance Company may cancel the policy due to the
> following reasons only:
>
>> with at least 90 days prior written notice, if the
>> Insurance Company ceases to offer coverage of this
>> type, in accordance with applicable State or Federal
>> Law;
>>
>> as of any Premium due date, if the premium is not
>> received at the Home Office or by an authorized agent
>> of the Insurance Company when due;
>>
>> immediately, if the Employer has performed an act or
>> practice that constitutes fraud or has intentionally
>> misrepresented a material fact;
>>
>> as of any Premium due date, if the number of insured
>> Employees or if the number of insured Dependents fails
>> to meet the minimum required per group participation
>> rules; or for failure to comply with other material
>> plan provision relating to Employer contributions or
>> group participation rules;

if the Insurance Company withdraws from the health insurance market with prior written notice and in accordance with applicable state or Federal Law;

in accordance with any applicable state law, if it is determined that the size of the Employer group has changed, making such group eligible for a guaranteed issued small group product;

in accordance with any applicable state or Federal Law, if prior notice is given to the Employer . . . .

Coverage will cease at midnight on the date on which termination occurs, unless otherwise stated above.

Uniform Modification of Coverage. At renewal, the provisions of this policy may be modified to reflect product revisions which have been uniformly made to this product.

(Policy at A147; see also Ex. C, Affidavit of Anthony J. Crean, sworn to Dec. 3, 2002 ("Crean Aff.") ¶¶ 6, 7.)

On May 21, 2001, the Debtors filed a voluntary petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code. Notwithstanding Teligent's bankruptcy petition, both Teligent and Cigna continued to perform their respective obligations under the Policy. As the Bankruptcy Court noted in its January 8, 2004 Memorandum Decision, "Between September 1, 2002 and October 31, 2003, Cigna processed approximately 5,811 claims arising under the [Policy], issuing 4,230 checks in the aggregate amount of $1,016,926.00." In re Teligent, Inc., 306 B.R. 752, 760 (Bankr. S.D.N.Y. 2004)(citing Crean Aff. ¶ 2.).

In or around October 2001, Teligent retained insurance

broker Mark Lynne of Bolton, Offutt & Donovan ("BOD"), to assist

Teligent in renewing the Policy and to investigate potential

insurance coverage by alternative insurance providers.[4]

Employees at Teligent and Cigna, along with Mark Lynne, engaged

in email exchanges regarding the Policy. (See A157-A165.) The

Representative relied on these emails to support her contention

that the Cigna Policy was terminated in December, 2001 and that

subsequent contracts were entered into in 2002.

On October 18, 2001, Cathy L. Proctor, a Client Manager for

Cigna sent an email to Christine Wolf, who appears to be an

employee at Teligent,[5] to check on "the current status of

Teligent" and to ask which broker at BOD was handling the

renewal of the Policy on behalf of Teligent. (A158.) In this

email, Ms. Proctor noted that, "As we look to the renewal, it

would be helpful to know if you need a proposal for [January 1]

and the number of assumed insureds by the first of the year."

(Id.)

On October 25, 2001, Ms. Proctor answered the email

response sent by Ms. Wolf on October 18, 2001 regarding the

---

[4]The firm Bolton, Offut, & Donovan, referred to in this Order as
"BOD," changed its name to "Bolton Partners" in 2002. (See
A163.)
[5]Christine Wolf used a Teligent email address, and the text of
the email suggests that she is involved in the Policy renewal
process for Teligent. (See A157.)

renewal of the Policy.  (A157.)  Ms. Proctor noted that she was attaching informal spreadsheets to the email and that the effective date of January 1, 2002 was approaching.  (Id.)  Ms. Proctor noted that this was a "difficult renewal" and that Teligent's claims were continuing to outpace premiums.  (Id.)  Ms. Proctor described "the current enrollment at the time of the rerate was 2,144 (April [2001]) falling to 1,167 as of Sept [2001]."  (Id.)  Ms. Proctor cautioned that if Teligent's enrollment increased or decreased by 15% or more from the enrollment assumptions used in establishing the rates, or if there were any changes in state or federal law which would impact benefit levels, Cigna reserved the right to revise the rates and fees.  (Id.)

On December 11, 2001, Mr. Lynne sent an email to both Ms. Proctor and Ms. Wolf, noting that "all the things we asked for were reviewed with positive results.  The mechanics of the renewal, however, contain some changes and new items that have substantially mitigated the results of your good work."  (A159.)  Mr. Lynne noted that the figures regarding paid claims that were listed on the page dealing with rate renewal did not match the figures listed on the claims and enrollment page.  (Id.)  He also questioned certain calculations on the rate renewal page.  (Id.)  Mr. Lynne expressed a desire to resolve these issues

quickly so that Teligent employees and COBRA participants could be informed of Policy details. (Id.)

In a December 12, 2001 email, Mr. Lynne wrote to Ms. Proctor and Ms. Wolf: "I wanted to follow-up on our conversation of late yesterday, and make one more attempt to convince you and the underwriter to re-do the numbers." (A160.) After comparing certain current renewal provisions with the previous renewal, Mr. Lynne observed that,

> The bottom line, as we discussed, is that such a large [rate] increase will, in my opinion, make matters worse for CIGNA, since it will drive away the healthier COBRA people. It seems your best course of action is to produce a reasonable renewal and hope to keep as many people on as possible. It doesn't make sense to try to recoup past losses with a large increase applied to a small population.

(Id.)

The Representative contends that the Policy terminated in December 2001, but there is no evidence of that fact and the Representative has offered no documents or testimony to support that assertion. Lynne M. Dumas, Teligent's Director of Human Resources, submitted an affidavit which states that, following the inability to obtain alternative coverage "in February 2002, the Debtors renewed the CIGNA Contract for a period of six months, which was the longest renewal period to which CIGNA would agree." (Aff. of Lynne M. Dumas dated Oct. 30, 2003, attached at A093.) Cigna's Underwriting Account Executive,

9

Anthony J. Crean, swore in his affidavit that, "the 'renewals' referenced in the Affidavit refer to 'rate renewals,' a term referencing periodic rate adjustments allowed under the Contract." (Crean Aff. ¶ 9.) He also explained that, "The Contract does not have a fixed term and expressly provides for continuing coverage until termination by one of the parties .... the Contract expressly provides for periodic rate reviews whereby Cigna may adjust premiums as supported by claims experience and population of the group." (Id. ¶¶ 7, 8) Crean also swore that "[c]overage under the Contract began on January 1, 1998, and has never been terminated or cancelled." (Id. ¶ 4.)

There were further email exchanges in 2002, which the Representative again relies on to support the contention that the original Policy had been terminated and a new Policy came into existence in June 2002.

On May 9, 2002, Lynne Dumas sent an email to Mark Lynne and others, in which she attached "revised census data" and asked Mr. Lynne to assess what the rates would be. She noted that she was looking for a comparison of rates of a few companies the size of Teligent so that she could "share with our General Counsel and we can start planning our strategy for presentations to the board." (A162.) Ms. Dumas noted that,

> We are quite anxious to get a feel for what the rates will
> look like from alternate carriers.  If the rates are too
> outrageous we may run across problems getting internal
> approval for the necessary budget to cover the expenses and
> thus we would need to find alternative solutions.  (Id.)

Mr. Lynne forwarded this email to Ms. Proctor, who sent an email

response to both Mr. Lynne and Ms. Dumas on May 21, 2002, noting

that the underwriter would use the revised census file as the

basis for the renewal projection.  (A162.)  In addition, Proctor

noted that, "If everything runs smoothly, I hope to have some

indication by Thursday as to whether a rerate for [August 1] is

required.  Assuming it is necessary, underwriting has committed

to getting the renewal to me by next Wednesday, May 29th."

(Id.)

By letter dated May 23, 2002, Cathy Proctor explained to

Lynne Dumas as follows:

> I am pleased to inform you that the underwriter has
> completed the renewal analysis and has agreed to further
> extend the current rates through December 31, 2002.  As you
> are aware, the rates were subject to review as of July 1st
> and a one month extension was granted.  Subsequently we are
> agreeing to hold the rates through the end of the year.
> We will plan to begin the upcoming renewal analysis in
> early October for the upcoming January 1st timeframe.

(A156.)

On September 6, 2002, Teligent's Third Amended Plan of

Reorganization Under Chapter 11 of the Bankruptcy Code (the

"Plan") was confirmed.  (See Ex. A.)  The Plan became effective

on September 12, 2002, the same day that Bloom, Borenstein &
Savage, P.C., a predecessor firm to Savage & Associates, P.C.,
was selected as the Representative.  The Plan substantively
consolidated the affiliated debtors into a single entity
("Reorganized Teligent").  Upon confirmation, all of the
property of the estate reverted in Reorganized Teligent with the
exception of the "Chapter 5 Causes of Action" and the "Unsecured
Claim Fund," which were transferred to the Representative.
Under the Plan, the Representative was authorized "to pursue the
Chapter 5 Causes of Action and determine the validity, priority,
and amount of the General Unsecured Claims . . . ."  (See Ex. A,
Art. I, ¶ B.69.)

     Teligent moved on or about September 5, 2002, to assume the
Cigna Contract along with several hundred other executory
contracts and unexpired leases (the "Assumption Motion").  On
October 18, 2002, the Bankruptcy Court authorized the assumption
of the Policy.  (Supplemental Order Authorizing the Assumption
of Certain Executory Contracts (the "Assumption Order"), dated
Oct. 18, 2002.)  Upon assumption, the Policy became an asset of
Reorganized Teligent.

     On October 16, 2002, Mr. Lynne sent an email to Ms. Dumas
to inquire about the current census and "whether [Teligent's]
new status has any effect on the requirement to keep the COBRA

people on the plan." (A163.) On November 6, 2002, Mr. Lynne sent another email to Ms. Dumas informing her that he expected to receive final renewal numbers from Cigna within two days. In the email, he observed that, "[Cigna's] initial renewal was an increase . . . but [Ms. Proctor] expects it to be higher when the results of the enrollment are factored in." (A164.) Mr. Lynne added:

> The issue with the other carriers (and in a way with Cigna as well) is that you would not be considered "small group" for rating purposes until your total enrollment (including COBRA) dropped below 50 . . . . In addition, most carriers have a limit to the percent of the group which can be COBRA . . . . I should know something more definitive next week about possible alternatives to Cigna.

(Id.)

Later that day, Mr. Lynne sent an email to Ms. Dumas regarding two of the three insurance carriers that he had approached as possible alternative insurance providers for Teligent. These other carriers informed Mr. Lynne that, like Cigna, they had a 10% limit on the enrollment of COBRA employees. Mr. Lynne noted that he was "trying to get [the alternate insurance carriers] to focus on the fact that by August[, Teligent] will be at 10%," although as Mr. Lynne noted, "I think it will be an uphill battle." (A165.)

On May 13, 2003, the Representative filed a complaint against Cigna and Cigna Behavioral Healthcare to recover over $9

million in pre-petition preferences and over \$1 million in post-petition transfers.  An amended complaint, filed by the Representative on August 1, 2003, subsequently dropped Cigna Behavioral Healthcare.  As the remaining defendant, Cigna moved to dismiss the amended compliant, invoking the well-settled doctrine that a preference action may not be maintained for payments made in connection with an assumed executory contract. See In re Teligent, Inc., 306 B.R. at 756 (citing Kiwi Int'l Air Lines, Inc., 344 F.3d 311, 318 (3d Cir. 2003); In re Superior Toy & Mfg. Co., Inc., 78 F.3d 1169, 1172 (7th Cir. 1996)).  In response, the Representative moved to vacate the portion of the Bankruptcy Court's Assumption Order that authorized the assumption of the Policy.  (See "Motion to Vacate," Cigna Appendix, Tab 5.)  Both Cigna and Teligent opposed this Motion to Vacate.  (See Cigna Appendix, Tabs 6, 7.)

After it was fully briefed, a hearing on the Representative's Motion to Vacate was held before the Bankruptcy Court on November 19, 2003, the same day that the Representative filed objections to Cigna's Motion to Dismiss the Representative's amended complaint.[6]  At the November 19, 2003

---

[6]The Bankruptcy Court denied the Representative's Motion to Vacate in a Memorandum Decision dated January 8, 2004.  See In re Teligent, Inc., 306 B.R. 752 (S.D.N.Y. 2004).  That decision has been appealed and is the subject of a separate Order by this Court.

hearing on the Representative's Motion to Vacate, the Bankruptcy
Court also heard argument on the issues raised on Cigna's Motion
to Dismiss, particularly the question of whether the Policy
between Cigna and Teligent constituted one agreement or a series
of separate insurance agreements as a result of periodic rate
renewals and re-ratings between Cigna and Teligent.

At the hearing, the Bankruptcy Court asked the parties
whether there were any disputed factual issues with respect to
the Policy. (See Ex. O, attaching as Ex A, Tr. of hearing dated
Nov. 19, 2003, at 35.) Counsel for Cigna noted that the Policy
was terminable and that it expressly provided for rate renewals.
(See id.) The Bankruptcy Court noted that the Representative
agreed that the Policy provided for termination and renewal, and
that he would therefore address the issue of whether a renewal
constituted a termination of the Policy as a purely legal issue.
(See id. at 36.) The Bankruptcy Court also noted that it did
not have a copy of the Policy, and counsel for Cigna
acknowledged that the Bankruptcy Court did not have a complete
record to make a determination on Cigna's Motion to Dismiss the
Representative's amended complaint. (See id. at 49-50.)

On January 22, 2004, the Bankruptcy Court held another
hearing at which the parties were asked about the existence of
any insurance contracts or policies between Cigna and Teligent

15

in addition to the Policy executed on or about January 1998. (See Ex. O, attaching as Ex. B, Tr. of hearing dated Jan. 22, 2004, at 11-12.) The Representative was also asked whether the Representative consented to the Bankruptcy Court's proposal to treat Cigna's Motion to Dismiss as a motion for summary judgment. (See id. at 8-9.) The Bankruptcy Court gave the Representative an opportunity to oppose the motion for summary judgment by submitting an affidavit pursuant to Rule of Civil Procedure 56(f) detailing any additional discovery that was needed. (See id. at 14-15.) After the hearing, in a letter to the Bankruptcy Court, the Representative declined the opportunity to file an affidavit under Rule 56(f) and consented to having the Motion to Dismiss treated as a motion for summary judgment. (See Ex. O.)

The Bankruptcy Court granted Cigna's Motion and dismissed the Representative's amended complaint in a bench decision issued on May 27, 2004. (See Ex. S at 101.) In this bench decision dated May 27, 2004, the Bankruptcy Court found that the Debtors had assumed the Policy as a single contract in October 2002. The Bankruptcy Court noted that because the Policy "does not have a fixed term, but provides for rate adjustments during the life of the contract, a rate renewal does not give rise to a renewal or a different contract." (Id. at 98.) Relying on the

factors described in a decision by the Delaware Chancery Court,

_In re Smith Corona Corp._, 210 B.R. 243 (D. Del. 1997), _opin._

_amend._, 212 B.R. 59 (D. Del. 1997), the Bankruptcy Court

explained that:

> [The Policy] continued indefinitely until it was terminated
> either by one of the parties or automatically upon non-payment
> of premiums.  Most important, the re-rating [of the Policy]
> did not terminate or cancel the existing policy.  At most, it
> gave Teligent the right to cancel.  Moreover, the re-rating of
> the Policy could have [occ]ured from time to time, and hence
> there was no fixed periodic offer and acceptance.  In
> addition, all amendments to the contract in later years
> referred to the original policy number.

(_See_ _id._ at 100-01.)

In light of these factors, the Bankruptcy Court concluded that,

much like the insurance policy at issue in _In re Smith Corona_,

there was only one Policy and that Teligent had assumed that

Policy in October 2002.  (_See_ _id._ at 101.)  On June 10, 2004,

the Bankruptcy Court issued its Order granting Cigna's Motion to

Dismiss the Representative's complaint.  (_See_ Ex Q.)  On or

about June 11, 2004, the Representative filed a notice of appeal

of the Bankruptcy Court's bench decision and subsequent Order.

(_See_ Ex. R.)

## II.

The Court reviews the Bankruptcy Court's legal decisions de

novo and its factual findings under a clearly erroneous

standard.  _In re Ionosphere Clubs, Inc._, 922 F.2d 984, 988 (2d

Cir. 1990). Where the appellant challenges a grant of summary judgment, the appellate court reviews the lower court's ruling de novo because the determination that there are no genuine issues of material fact is a legal conclusion. See FDIC v. Giammettei, 34 F.3d 51, 54-55 (2d Cir. 1994)(district court's grant of summary judgment is reviewed de novo); Hanover Direct, Inc. v. T.R. Acquisition Corp. (In re T.R. Acquisition Corp.), No. 02 Civ. 8487, 2003 WL 21910860, at *4 (S.D.N.Y. Aug. 8, 2003)(the district court reviews a bankruptcy court's grant of summary judgment de novo); Vanco Trading, Inc. v. Monheit, No. 95 Civ. 02681, 1999 WL 464531, at *1 (D. Conn. June 17, 1999)(determination of whether a genuine issue of material fact exists is a question of law).

The standard for granting summary judgment is well established. Summary judgment may not be granted unless "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056 (adopting Fed. R. Civ. P. 56 in adversary proceedings); see also Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Gallo v. Prudential Residential Servs. Ltd. Partnership, 22 F.3d 1219, 1223 (2d Cir. 1994). "The trial court's task at the summary judgment motion

stage of the litigation is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." Id., 22 F.3d at 1224.

The moving party bears the initial burden of "informing the district court of the basis for its motion" and identifying the matter that "it believes demonstrate[s] the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  The substantive law governing the case will identify those facts which are material and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)(citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); see also Gallo, 22 F.3d at 1223.

If the moving party meets its burden, the burden shifts to the nonmoving party to come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P.

56(e); Fed. R. Bankr. P. 7056.  With respect to the issues on which summary judgment is sought, if there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper.  See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 37 (2d Cir. 1994); see also Schick et al. v. Cassirer (In re Schick), No. 97 Civ. 9300, 1998 WL 397849, at *1 (S.D.N.Y. July 16, 1998).  The nonmoving party must produce evidence in the record and "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible."  Ying Jing Gan v. City of New York, 996 F.2d 522, 532 (2d Cir. 1993); see also Scotto v. Almenas, 143 F.3d 105, 114-15 (2d Cir. 1998)(collecting cases).

### III.

On appeal, the Representative argues that the Bankruptcy Court erred in applying the law of Connecticut, as set forth in In re Smith Corona, instead of applying the laws of Delaware and Virginia.  Moreover, the Representative argues that the Bankruptcy Court erred as a matter of law because the original Policy was not an executory contract that Teligent could assume or reject pursuant to 11 U.S.C. § 365.  The Representative contends that an insurance contract must be executory in order to be assumed by a debtor, and that the original insurance

contract had expired, during the Debtors' Chapter 11 cases and
before the filing of the Assumption Motion, because of Policy
renewals.  In other words, the Representative argues that the
original insurance contract executed in or about January 1998
could not be assumed because the original insurance contract had
terminated before assumption.  To support the Representative's
position that each renewal constituted a new and separate
insurance contract, the Representative cites cases which find
that contracts that have expired before assumption cannot be
assumed, and that policies that have expired before confirmation
are not executory contracts and therefore cannot be subject to
assumption or rejection.  See, e.g., In re Texscan Corp., 107
B.R. 227 (B.A.P. 9th Cir. 1989)(noting that contracts that
expire by their own terms before Section 365(a) motion is
brought or a plan of reorganization providing for assumption is
confirmed cannot be assumed), aff'd on other grounds, 976 F.2d
1269 (9th Cir. 1992)[7]; In re Ames Dep't Stores, Inc., No. 93 Civ.
4014, 1995 WL 311764, at *3 (S.D.N.Y. May 18, 1995)(noting that
insurance policies executed pre-petition, whose policy periods
expired prior to confirmation of plan of reorganization are

---

[7]Affirming the decision of the Bankruptcy Appellate Panel, the
Court of Appeals for the Ninth Circuit concluded that the
contract at issue was not executory and therefore did not reach
the issue of whether the contract had expired before it could be
assumed or rejected pursuant to 11 U.S.C. § 365.  See In re
Texscan Corp., 976 F.2d 1273 n.1.

typically deemed nonexecutory contracts that cannot be assumed or rejected).

Cigna responds that the Policy at issue in this case never terminated and therefore the Policy assumed was the original Policy. Cigna argues correctly that the insurance policies in the cases cited by the Representative had already expired by their own terms prior to assumption. Cigna contends that, in contrast to each case cited by the Representative, the Policy in this case has no fixed term, never expired, and was never terminated or cancelled. (See Crean Aff. at ¶¶ 4, 7.) Rather, Cigna argues that under its express terms, the Policy at issue may be terminated by Cigna only for cause. (See Crean Aff. ¶ 6.) According to Cigna, the rate renewals at issue are periodic adjustments to insurance premiums, which are expressly allowed under the Policy (see id. at ¶ 8-9), and are "analogous to that of a term life insurance policy in that the insurer may periodically increase the premium, but the policy is neither cancelled nor terminated, and the policy continues, so long as premiums are paid." (Id. at ¶ 10.)

In its bench decision dated May 27, 2004, the Bankruptcy Court agreed with Cigna, finding that there was only one insurance policy that continued indefinitely until it was terminated by one of the parties, such as for the non-payment of

premiums.  The re-rating did not terminate or cancel the Policy;

at most, it gave Teligent the right to cancel the Policy.  The

re-rating could have occurred from time to time, and hence,

there was no fixed periodic offer and acceptance.  (See Ex. S at

99-100.)

### A.

The parties agreed before the Bankruptcy Court that the

issue of whether the 1998 Policy terminated as a result of rate

renewals was to be decided as a matter of law.  (See Ex. O,

attaching as Ex. B, Tr. of hearing dated Jan. 22, 2004, at 8-9,

11-19.)  There is a threshold question of whether federal or

state choice of law rules govern the determination of which

state's substantive law of contracts applies to the

Representative's claim.

The Court of Appeals for the Second Circuit has not

resolved which choice of law provisions apply where the dispute

involves a preference action arising under the Bankruptcy Code.

See Koreag, Controle et Revision, S.A. v. Refco F/X Assocs.,

Inc., (In re Koreag, Controle et Revision, S.A.), 961 F.2d 341,

350 (2d Cir. 1992)(discussing choice of law in ancillary

proceeding under Bankruptcy Code); see also In re Gaston & Snow,

243 F.3d 599, 606-07 (2d Cir. 2001)(discussing choice of law in

adversary proceeding in Bankruptcy Court).  However, as in In re

<u>Koreag</u>, it is unnecessary to resolve whether federal choice of

law principles or the choice of law principles of New York as

the forum state should be applied.  That is true because both

New York and federal choice of law rules require that a

contractual choice of law provision, such as exists in the

Policy at issue in this case, should be honored provided that

there is some relationship between the law chosen and the

transaction.  <u>See</u> <u>Schiavone Constr. Co. v. City of New York</u>, 99

F.3d 546, 548 (2d Cir. 1996)(finding that New York law

recognizes and enforces contractual choice of law provisions);

<u>Advani Enters., Inc. v. Underwriters at Lloyds</u>, 140 F.3d 157,

162-63 (2d Cir. 1998)(federal choice of law rules accord

significant weight to a choice of law provision in a contract);

<u>Siegelman v. Cunard White Star Ltd.</u>, 221 F.2d 189, 193, 195 (2d

Cir. 1995); <u>Lewis Tree Serv., Inc. v. Lucent Technologies, Inc.</u>,

No. 99 Civ. 8556, 2002 WL 31619027 (S.D.N.Y. Nov. 20, 2002).

The Policy between Teligent and Cigna originally contained

a choice of law provision that states that "these policies are

issued in Virginia and shall be governed by its laws."  (<u>See</u>

Policy at A125.)  The parties later amended the Policy so that

it was to be governed by Delaware law, where Teligent is

incorporated.  (<u>See</u> letter dated Oct. 20, 2000 from Michael W.

Drago to John Barrett at A122.)  Effective January 1, 2001, the

24

parties agreed that the policy would be modified to conform to
Delaware legislation and that the Policy would be "sitused" in
Delaware.  The Representative alleges that the original policy
governed by Virginia law had terminated as early as December
2001, that the alleged June 2002 agreement was the only
insurance contract in effect at the time that the Plan was
confirmed, and that only this June 2002 insurance contract
between Cigna and Teligent could have been assumed subject to
the Bankruptcy Court's Assumption Order.  Accordingly, all of
the relevant issues in this case, namely, the ongoing status of
the Policy in and after December 2001, are governed by the
substantive law of Delaware pursuant to the parties' amendment
effective January 1, 2001.

It is clear that the Bankruptcy Court understood that the
Policy was governed by Delaware law.  (See Bench Decision at
95.)  The Bankruptcy Court relied on the decision of the
Delaware Chancery Court in In re Smith Corona Corp., 210 B.R.
243 (D. Del. 1997), because that case, although decided under
Connecticut law, considered an insurance contract that was
analogous to the Policy at issue in this case and considered the
very same issue, namely whether the insurance contract was a
series of one year policies, or was one contract that had been
renewed many times.  See In re Smith Corona Corp., 210 B.R. at

25

247. Relying on the same factors as the In re Smith Corona court, the Bankruptcy Court concluded that the Policy between Cigna and Teligent was also a single contract that had been re-rated on a number of occasions, and that the Policy was not a series of separate contracts created with each re-rating.[8]

Delaware has not ruled definitively on whether, in the absence of any express termination provision in an existing insurance contract, a rate renewal constitutes a new and separate contract, and In re Smith Corona remains the most analogous case cited by any party. The Representative has made no showing that the application of Connecticut law results in an outcome that is different from the result that is reached by applying Delaware, or even Virginia law.

In re Smith Corona was not applying any unique principle of Connecticut law. The In re Smith Corona court distinguished one Connecticut decision that Smith Corona had relied on for the existence of separate contracts, Phelan v. Everlith, 173 A.2d 601, 602 (Conn. Cir. Ct. 1961), because the insurance contract at issue in Phelan had expired on its own terms at the end of one year. See In re Smith Corona Corp., 210 B.R. at 247;

---

[8]The Representative argues that the In re Smith Corona decision has been discredited by In re Oread, Inc., 269 B.R. 871, 879 (D. Kan. 2001), but that decision does not deal with the issue of policy renewals and does not in any way disturb the conclusions reached by the Bankruptcy Court in this case.

Phelan, 173 A.2d at 602. The In re Smith Corona court explained

that Phelan was not controlling in cases, like this one, where

the contract continues indefinitely unless one of the parties

terminates the contract. See id., 210 B.R. at 247.

Accordingly, the In re Smith Corona court relied on Connecticut

law merely for the principle that the court should examine the

language of the insurance contract itself. See id. (citing Cox

v. Peerless Ins. Co., 774 F. Supp. 83, 86 (D. Conn. 1991)(noting

that where language of insurance policy was clear and

unambiguous, court was left to determine, as a matter of law,

whether plaintiff's claims were within plain meaning of policy's

language)).

The same principle governs contract disputes under both

Delaware and Virginia law. Under the laws of both Delaware and

Virginia, in disputes between parties regarding the proper

interpretation of the language of an insurance contract, courts

should first seek to determine the parties' intent from the

language of the insurance contract itself. See, e.g., Alstrin

v. St. Paul Mercury Ins. Co., 179 F. Supp. 2d 376, 388 (D. Del.

2002); Seabulk Offshore, Ltd. v. American Home Assur. Co., 377

F.3d 408, 419 (4th Cir. 2004).

As the Bankruptcy Court correctly found, In re Smith Corona

remains the most analogous and persuasive case to be used in

interpreting the similar issue and contract in this case. None
of the parties have found a more analogous case. The
Representative has failed to point to an analogous case under
Delaware law, or indeed any law, where an insurance contract
without a termination date should be construed as having been
terminated simply because the parties provided for re-ratings
and those re-ratings occurred. From the terms of the Policy,
the parties intended that the Policy would continue until
terminated. Cigna was required to continue to provide coverage
unless an event occurred under the Policy that allowed Cigna the
ability to terminate. The Policy allowed re-ratings but, if
Teligent was dissatisfied with a re-rating, it could choose to
terminate the Policy. There is no dispute that Teligent did not
walk away from the Policy at any time or terminate it. There is
also no evidence that either party breached the Policy.

In addition, the other indicia of an ongoing contract are
also present. The parties continued to use the original Policy
number on all amendments. The re-ratings were not required to
be done at any particular time beginning twelve months after the
effective date of the Policy. There is, in short, no provision
of the Policy that supports the argument that the Policy was
terminated simply because the rates were periodically changed.

The cases on which the Representative primarily relies are inapposite because they involve contracts with fixed terms or termination dates.  In those circumstances, the cases stand for unexceptional propositions, including the principles that each new insurance contract is distinct, and that an offer to renew insurance contracts, once accepted, results in a new contract. See, e.g., Pacific Mut. Life Ins. Co. of California v. Vogel, 232 F. 337 (3rd Cir. 1916)(finding renewal receipt was a mere offer and could not become a contract until accepted by the insured); In re Camilla Food Stores, Inc., 287 B.R. 52 (Bankr. E.D. Va. 2002)(applying Virginia law that each new insurance contract is distinct); Aetna Cas. & Sur. Co. v. Harris, 239 S.E.2d 84 (1996)(finding no renewal by insured who failed to comply with terms of policy).  In each of these cases, the insurance contract at issue had a fixed end date and had already expired by its own terms before renewal.  See, e.g., In re Camilla Food Stores, Inc., 287 B.R. 60-61 ("Given Virginia law indicates a renewal of an insurance contract is a new contract and the Worker's Compensation policy itself indicates every policy will only last approximately one year, thus, the 2001 premiums do not arise from the same contract as any of the previous premiums.")  Here, the Representative has cited numerous cases that indicate that once a policy has terminated,

each new renewal is a new contract that requires its own offer and acceptance. However, the Representative has not pointed to any provision of the Policy that demonstrates that the Policy in this case terminated on a set date or expired after a fixed period of time.

Indeed, the Representative alleges that the Policy has terminated only as a result of the periodic re-ratings. The Representative relies on the emails in the record surrounding the renewal of the Policy, but these emails are insufficient to establish an issue of material fact. These emails reflect only that there were negotiations over rate renewals. The emails reveal that Teligent tried to convince Cigna to lower its insurance rates and that Teligent looked for alternate insurance providers. Whatever the new rates were, Cigna continued to provide insurance and Cigna continued to pay the premiums. The emails do not show that the insurance contract was ever terminated. Indeed, there is no evidence that the Policy ever terminated. Accordingly, the Bankruptcy Court correctly found that the Policy between Cigna and Teligent constituted a single insurance contract that Teligent had assumed in October 2002.

CONCLUSION

The Bankruptcy Court's bench decision and subsequent Order granting summary judgment in favor of Cigna is **affirmed.**

**SO ORDERED.**

**Dated: New York, New York**
**May 12, 2005**

John G. Koeltl
United States District Judge